**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-2109**

———————

MICHAEL N. HERLIHY; ANN HERLIHY; THE ESTATE OF PETER L.
BERGRUD,

> Claimants - Appellants,

v.

DBMP, LLC,

> Debtor - Appellee.

-----------------------------------------

OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS
OF DBMP, LLC,

> Amicus Supporting Appellant.

———————

Appeal from the United States District Court for the Western District of North Carolina, at
Charlotte.  Kenneth D. Bell, District Judge.  (3:24-cv-00558-KDB)

———————

Argued:  October 22, 2025                                  Decided:  February 11, 2026

———————

Before NIEMEYER, KING, and HARRIS, Circuit Judges.

———————

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Harris
joined.  Judge King wrote a dissenting opinion.

———————

**ARGUED:** Jonathan Ruckdeschel, THE RUCKDESCHEL LAW FIRM, LLC, Ellicott City, Maryland, for Appellants. C. Kevin Marshall, JONES DAY, Washington, D.C., for Appellee. **ON BRIEF:** Thomas W. Waldrep, Jr., Chris W. Haaf, Diana S. Johnson, WALDREP WALL BABCOCK & BAILEY PLLC, Winston-Salem, North Carolina; John L. Steffan, St. Louis, Missouri, Clayton L. Thompson, MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC, New York, New York, for Appellants. Gregory M. Gordon, Dallas, Texas, Jeffrey B. Ellman, Atlanta, Georgia, Sarah Welch, JONES DAY, Cleveland, Ohio; Garland S. Cassada, Richard C. Worf, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Appellee. Natalie D. Ramsey, Davis Lee Wright, ROBINSON & COLE LLP, Wilmington, Delaware; Kevin C. Maclay, Todd E. Phillips, Jeffrey A. Liesemer, CAPLIN & DRYSDALE, CHARTERED, Washington, D.C., for Amicus Curiae.

NIEMEYER, Circuit Judge:

Michael Herlihy, his wife Ann Herlihy, and the Estate of Peter Bergrud are plaintiffs in asbestos-grounded tort actions against DBMP LLC, and their actions have been automatically stayed by DBMP's filing of this Chapter 11 bankruptcy proceeding, pursuant to 11 U.S.C. § 362(a), as well as by a preliminary injunction that the bankruptcy court entered to give effect to the stay. The plaintiffs filed motions to lift the stay and to stay the preliminary injunction, urging that they be allowed to prosecute their asbestos claims against the debtor before a judge and jury in the traditional tort system. They justified their request with the argument that DBMP obtained the stay "in bad faith" because it is "non-distressed, massively wealthy, and fully capable of paying all claims in full," and therefore it was not entitled to invoke bankruptcy protection and the automatic stay that it provides.

The bankruptcy court denied the motions, applying the factors for deciding such motions from our longstanding precedent of *In re Robbins*, 964 F.2d 342 (4th Cir. 1992). The court found that lifting the stay would prejudice the debtor's estate, reduce judicial economy by flooding the tort system with asbestos cases, and "imperil" the ability of the court to "treat consistently and fairly all similarly situated claimants in a 524(g) plan." *See* 11 U.S.C. § 524(g) (authorizing a specific and unique Chapter 11 reorganization proceeding for debtors with a large number of pending and future personal injury claims based on exposure to asbestos-containing products). The bankruptcy court also observed that lifting the automatic stay would amount to a de facto dismissal of the bankruptcy proceeding. Finally, the court found that the plaintiffs had failed to demonstrate that DBMP acted in bad faith.

3

On appeal, the district court found that the bankruptcy court had not abused its discretion in denying the plaintiffs' motions to lift the automatic stay and accordingly affirmed the bankruptcy court by order dated October 28, 2024, relying on the bankruptcy court's factual findings and rulings of law.

We affirm that order, concluding that the bankruptcy court did not abuse its discretion in refusing to lift the automatic stay on finding that DBMP filed its Chapter 11 petition with the legitimate purpose of pursuing a § 524(g) plan, that it qualified for such a reorganization, and that the plaintiffs failed to present any evidence that DBMP had acted in bad faith.

I

During the period from the 1930s to the 1990s, CertainTeed Corporation was engaged in the manufacture and sale of various building products that contained asbestos, including cement pipe, asphalt roofing products, gypsum products, and railroad insulation products. In the 1970s, it began facing hundreds of thousands of asbestos-related tort claims based on allegations that its products released asbestos that caused asbestosis and mesothelioma, thereby causing injury to the plaintiffs in those claims. Although CertainTeed was a relatively minor defendant in the early waves of large-scale asbestos litigation, once the primary asbestos manufacturers began pursuing bankruptcy protection in the 2000s, the volume of claims against CertainTeed substantially increased. While CertainTeed paid out less than $10 million per year in asbestos-related claims in the 1990s, since 2002, it has spent an average of $80 million per year in payments to resolve such

4

claims, as well as an additional $20 to $30 million per year in legal defense costs. In total from 2002 until 2019, the company incurred roughly $2 billion in expenses defending and resolving over 300,000 asbestos lawsuits, and it paid approximately $1.5 billion of that sum out of pocket after exhausting its asbestos-related insurance coverage. Moreover, as of 2019, CertainTeed still faced approximately 60,000 pending asbestos-related claims in courts nationwide, with projections that such lawsuits would continue to be filed for "decades to come."

In the fall of 2019, CertainTeed determined that it would take advantage of the § 524(g) reorganization provision of the Bankruptcy Code, which was enacted in 1994 specifically to manage and resolve ongoing and future asbestos-related claims in circumstances like those facing CertainTeed. The § 524(g) procedure involves collecting all pending and future claims in a bankruptcy court and establishing a trust to pay the future claims on a basis equal to the pending claims. As the House Report for the § 524(g) legislation explained, "The asbestos trust/injunction mechanism established in the bill is available for use by any asbestos company facing a similarly overwhelming liability" as faced by Johns-Manville in the 1980s — whose circumstances, as described, were similar to those facing CertainTeed in 2019. H.R. Rep. No. 103-835, at 40–41 (1994), as reprinted in 1994 U.S.C.C.A.N. 3340.

To engage the process, CertainTeed split itself into two companies under Texas corporation law — which is curiously referred to as a "divisional merger" — by forming two new entities and assigning to them CertainTeed's liabilities and assets. *See* Tex. Bus. Orgs. Code Ann. § 1.002 (A)(55); *see also generally id*. § 10.001 *et seq*. One corporation

5

was called CertainTeed ("New CertainTeed") and the other, DBMP LLC, and under the procedure, the original CertainTeed (now "Old CertainTeed") ceased to exist. In the divisional merger, Old CertainTeed assigned all of its asbestos liabilities to DBMP, as well as $25 million in cash and all the equity of a cashflow-producing siding and trim business, Millwork & Panel, which had projected earnings before taxes of $16 million in 2020 and an estimated fair market value of $150 million. It assigned its remaining liabilities and assets to the New CertainTeed. At the same time, DBMP and New CertainTeed entered into an *uncapped* funding agreement that obligated New CertainTeed to satisfy DBMP's asbestos-related liabilities and, in case of bankruptcy, to pay for all costs related to administering a Chapter 11 reorganization, including the cost of resolving asbestos-related claims through a trust under 11 U.S.C. § 524(g). Under this agreement, none of Old CertainTeed's assets were protected from liability to pay the asbestos claims, but those claims were isolated so that they could be managed under a § 524(g) plan.

After this division of liabilities and assets and the creation of the uncapped funding agreement, DBMP filed a Chapter 11 reorganization petition to avail itself of the § 524(g) process.

The lawyers in these types of proceedings often, and perhaps pejoratively, refer to the divisional merger and bankruptcy filing as the "Texas Two-Step," referring to a common country western dance involving two quick steps and two slow.

As the result of the Chapter 11 bankruptcy filing, all asbestos-related state law tort claims against DBMP were automatically stayed pursuant to 11 U.S.C. § 362(a), and the bankruptcy court, in addition, entered a preliminary injunction that prohibited claimants

6

from bringing asbestos claims against New CertainTeed, affiliated entities, and Old CertainTeed's distributors. After the bankruptcy court appointed the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative (collectively "the Committee"), the Committee filed a motion to lift the automatic stay, as well as an objection to the preliminary injunction. The motion sought to permit all asbestos claims against DBMP to be prosecuted before a judge and jury in the traditional tort system in the various States and to be paid from corporate assets as would any tort judgment.

The bankruptcy court conducted hearings on the Committee's motion and objection over a period of five days in March 2021. The hearings included opening statements and arguments from the parties, live testimony from expert witnesses on financial and restructuring matters, and proffers of the parties' evidence, including DBMP's declarations, deposition designations, and various exhibits. After the hearings, DBMP offered a stipulation that the personal injury claims of any claimant with a pending asbestos claim shall be preserved, with no impairment of damages, even if the claimant subsequently dies.

In a thorough 79-page opinion dated August 10, 2021, the bankruptcy court first denied the motion to lift the automatic stay and issued an order recognizing that the asbestos claims against DBMP, including those formerly against Old CertainTeed, were subject to the automatic stay under 11 U.S.C. § 362(a)(1) and/or § 105. The court then ordered that the preliminary injunction prohibiting claimants from bringing asbestos-related claims against New CertainTeed, affiliated entities, and Old CertainTeed's distributors be maintained while the reorganization case proceeds. In denying the lift-stay

7

motion, the bankruptcy court considered and applied the factors from *In re Robbins*, 964 F.2d 342 (4th Cir. 1992), finding that lifting the stay would prejudice the debtor's estate by depleting estate resources and causing irreparable harm to the reorganization effort; would negatively impact judicial resources by "dumping more than 70,000 asbestos cases back into the tort system"; and would contravene Congress' clear purpose of establishing a "mechanism to resolve . . . asbestos liabilities in a single forum" through 11 U.S.C. § 524(g).

No party appealed this ruling, nor did any party file a motion to dismiss the bankruptcy case outright. Since the court's ruling in 2021, litigation has continued in the bankruptcy case through various adversary proceedings, and the bankruptcy court has approved a process for estimating DBMP's aggregate liability and ordered the parties to mediate a possible resolution of the Chapter 11 case.

Several years later, in April 2024, Michael Herlihy, Ann Herlihy, and the estate of Peter Bergrud (the "Claimants") filed motions to lift the stay, but only on their own behalf, to allow them to prosecute their two asbestos suits against DBMP in state courts in Washington and California. The Claimants are but three of the tens of thousands of plaintiffs who filed asbestos-related tort claims against Old CertainTeed and/or its various subsidiaries, predecessors, successors, or related companies. Michael Herlihy worked for about a decade for a saw sharpening company, and he regularly breathed in asbestos while sharpening saw blades that had been used in a CertainTeed cement pipe plant. Herlihy was diagnosed with mesothelioma in 2023. Peter Bergrud worked for decades in the construction industry, and he regularly cut, beveled, and drilled CertainTeed's asbestos-

8

infused cement pipe. Bergrud died from mesothelioma in 2019. In addition to their pending tort claims against DBMP, these Claimants also have pending claims, at various stages of litigation, against other asbestos defendants.

In their motions to lift the stay, the Claimants contended that DBMP filed its bankruptcy petition in bad faith, arguing that the Texas Two-Step process constituted subjective bad faith because even though DBMP and New CertainTeed are "wealthy and fabricated debtors, [who] boast the ability to pay all claims in full," they are using Chapter 11 not to reorganize but to deny Claimants the right to prosecute their claims in state court, thus delaying their potential recovery.

On May 28, 2024, the bankruptcy court denied the Claimants' motions to lift the stay. In doing so, the court incorporated its earlier rejection of the motion to lift the stay filed by the Committee in August 2021 and recognized that it had already rejected "substantially identical requests" on at least four occasions in other divisional merger cases before it. Even so, the court considered, as it did in 2021, each of the *Robbins* factors again, finding that granting the motions to lift the stay would prejudice the debtor's estate, reduce judicial economy by flooding the tort system with asbestos cases, and "imperil" the ability of the court to "treat consistently and fairly all similarly situated claimants in a 524(g) plan." The court further found that lifting the automatic stay would amount to a *de facto* dismissal of the bankruptcy. Finally, it concluded that the Claimants had failed to present any evidence that DBMP had filed in bad faith.

On appeal, the district court affirmed the bankruptcy court, and from the district court's order dated October 28, 2024, the Claimants filed this appeal.

9

II

The narrow question presented on appeal is whether the bankruptcy court properly denied the Claimants' motions for relief from the automatic stay, filed pursuant to 11 U.S.C. § 362(d).  To be clear, we do not have before us any motion to dismiss the Chapter 11 petition so as to challenge whether Chapter 11's § 524(g) reorganization procedure has been appropriately invoked in this case.  Nor do we have the question before us whether the pre-bankruptcy Texas Two-Step process is appropriate or legal.  Indeed, we also do not have before us the more fundamental question of whether Congress had constitutional authority to enact § 524(g) without requiring a showing of "insolvency."  Thus, in this *presumptively* viable Chapter 11 proceeding, we address only the standard for lifting a § 362(a) stay and whether the district court correctly applied that standard.[*]

To begin, the Bankruptcy Code provides that when a bankruptcy petition is filed, all judicial actions against the debtor are automatically stayed. 11 U.S.C. § 362(a)(1). Such a stay provides the bankruptcy court with the "opportunity to harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her obligations." *Robbins*, 964 F.2d at 345.  The stay thus serves the fundamental purposes and functions of bankruptcy.

---

[*] Many of the issues that the dissent raises and argues were not considered and decided by the district court, such as a would-be petition to dismiss the proceeding to challenge whether it properly invoked § 524(g) and, indeed, the Texas Two-Step process. *See* J.A. 1187 (where the district court similarly clarified "what issues are and are not before the Court in this appeal" from the bankruptcy court, noting that many of the issues that the dissent raises were not before the court).

10

Nonetheless, a bankruptcy court may, in its discretion, grant relief from the automatic stay if a party is able to demonstrate "cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d). Because "cause" is not otherwise defined, we have concluded that bankruptcy courts "must determine when [such] discretionary relief is appropriate on a case-by-case basis." *Robbins*, 964 F.2d at 345. But the term is not unmoored. We have provided a standard to apply the term, drawing limitations from context. Keeping in mind that a § 362(a) stay is designed to give the bankruptcy court the ability "to harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her obligations" — which imitates a fundamental function of bankruptcy — removal of such a stay must, at bottom, address what the stay provided. *Id*. Thus, as pointed out in *Robbins*, when considering a motion to lift an automatic stay, "[t]he court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *Id*. And accordingly, the factors to weigh are, on one side, the efficiencies in resolving the matter sought to be released from the stay in another court, assessing whether that court could handle the matter more efficiently and thereby provide judicial economy to the bankruptcy court, and, on the other side, whether the estate can still be protected for the benefit of creditors. *See id*. As articulated in *Robbins*, these relevant factors include:

> (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court;

11

and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*Id.* For decades, courts in this circuit have recognized *Robbins* as the controlling authority for deciding motions to lift an automatic stay. *See, e.g.*, *In re Lee*, 461 F. App'x 227, 231–33 (4th Cir. 2012) (applying the *Robbins* factors to determine whether the bankruptcy court abused its discretion when granting relief from an automatic stay); *In re McCullough*, 495 B.R. 692, 697–98 (W.D.N.C. 2013) (same).

After carefully reviewing the bankruptcy court's opinion, we conclude that it appropriately applied *Robbins*. It did so both when it first ruled on the lift-stay motion filed by the Committee in August 2021 and again when it ruled on the Claimants' similar motions in May 2024. The court found that granting the motions to lift the stay would "greatly" prejudice the debtor's estate and that such harm would outweigh any harm to the Claimants that might be caused by any delay in the resolution of their asbestos claims. More particularly, the court reasoned that granting the stay would reduce judicial economy by releasing a wave of asbestos cases back into the court system, severely undermining the bankruptcy court's ability to "treat consistently and fairly all similarly situated claimants in a 524(g) plan." The court was particularly concerned that granting the stay would imperil its ability to protect the interests of *future* asbestos claimants through the § 524(g) plan. And based on its experience with similar mass-tort bankruptcies, it predicted that lifting the stay would "effectively destroy the bankruptcy case." The court also found that any delays that might occur in the resolution of the Claimants' suits in bankruptcy provided an insufficient basis to lift the stay as such a proposition was speculative. The court pointed

12

out that, given the high volume of asbestos-related cases against the debtor, proceeding in the state court system would likely also result in substantial delays. Indeed, it noted that if the parties to DBMP's § 524(g) reorganization were to work toward the goals of the reorganization in good faith, resolution of the Claimants' claims in bankruptcy could be even faster than their resolution in state courts.

Thus, the bankruptcy court not only applied the *Robbins* factors correctly, but it provided extensive explanation as to why those factors suggest that granting the motion to lift the stay would undermine the entire bankruptcy proceeding.

While the Claimants do not seem to challenge the bankruptcy court's analysis under *Robbins*, they argue that *Robbins* is not dispositive because it did not address its argument that DBMP acted in bad faith in filing the Chapter 11 petition to obtain a stay. As for their bad faith argument, the Claimants contend that DBMP filed for bankruptcy as a "profitable, non-distressed" company and that the bankruptcy court should have granted relief from the automatic stay on that basis. According to Claimants, the CertainTeed divisional merger was an attempt to leverage bankruptcy's automatic stay so as to force them "into judicially compelled re-negotiations of state law liabilities," and this use of bankruptcy by a company that is not in financial distress constitutes sufficient bad faith and justifies lifting the automatic stay.

First, we agree that *Robbins* did not address whether a showing of bad faith would justify lifting the stay. That issue was not presented to the *Robbins* court. Because § 362(d) only requires a finding of "cause," *Robbins* focused textually on that term, holding that "cause" related to the purposes of the automatic stay and the effect of lifting it.

13

Nonetheless, we also agree with Claimants that good faith is an *implied* requirement for obtaining an automatic stay and that a showing of a lack of good faith, or bad faith, can therefore justify lifting the stay.

To reach this conclusion, we begin by addressing the larger context. Bankruptcy is an equitable procedure that is available to those who employ its benefits in good faith. And while what amounts to good faith or bad faith is ultimately contextual, it surely begins with resolution of the question whether the bankruptcy procedure is being used in accordance with its designed purpose. *See Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989). When a debtor manipulates the bankruptcy procedure for some other purpose or steps outside the equitable limitations of the Bankruptcy Code, his good faith comes into question, placing in doubt any relief he seeks in bankruptcy. *Id*. at 699 (citing *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984)). Thus, the requirement of good faith permeates the entire Bankruptcy Code. *See, e.g.*, *In re Premier Automotive Servs.*, 492 F.3d 274, 279 (4th Cir. 2007); *Carolin*, 886 F.2d at 698–700; Fed. R. Bankr. P. 9011(b); *Collier on Bankruptcy* § 362.07[3] (Resnick & Sommers, eds., 16th ed. 2011). In light of this, it follows that when a bankruptcy court addresses a motion to dismiss a Chapter 11 petition under 11 U.S.C. § 1112(b) (authorizing dismissal "for cause"), it may consider a lack of good faith as implicit in the "cause" requirement. *Carolin*, 886 F.2d at 699. And in a similar vein, we also observed in *Carolin*, albeit in dictum, that the same principle would apply when determining "cause" on a motion to lift the automatic stay under § 362(d). *Id*.

14

But a bad-faith cause for dismissal of a petition or for granting a motion to lift the automatic stay is not without boundaries. Otherwise, it could subsume and frustrate explicit statutory requirements. Thus, we have noted that the lack-of-good-faith requirement implied in "cause" in both § 1112(b) and § 362(d) requires the movant to show both subjective bad faith and objective futility. *Premier*, 492 F.3d at 279–80; *Carolin*, 886 F.2d at 700–01. The subjective bad faith inquiry focuses on the question whether a petitioner actually *intends* to use the applicable provision for its intended purpose, *i.e.*, in a Chapter 11 proceeding, "to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business." *Carolin*, 886 F.2d at 702 (cleaned up). And the objective futility inquiry focuses on the question whether "there is embodied in the petition some relation to the statutory objective of resuscitating a financially troubled debtor." *Id*. at 701 (cleaned up).

In this case, the bankruptcy court, when denying the Claimants' motions to lift the stay, addressed not only the *Robbins* standard but also the Claimants' bad faith argument. It found that there was a lack of evidence in the record of subjective bad faith, and even if there were such evidence, the Claimants had failed to meet the objective futility requirement. The court explained, "I don't feel comfortable making that conclusion today [on subjective bad faith], *not on this record* or at this stage in the case." (Emphasis added). Yet when addressing the Claimants' argument that a non-distressed, solvent company's use of bankruptcy tools necessarily amounts to bad faith, it responded that the answer "appears to be no."

15

We agree with the bankruptcy court that the record does not include evidence to suggest bad faith. DBMP was legitimately seeking to invoke the § 524(g) process authorized by Congress to address the circumstances in which it faced 60,000 pending asbestos-related claims and expected to receive a continuous flow of such lawsuits for decades to come. That circumstance was precisely the kind that prompted Congress to enact § 524(g). It would be hard to argue that DBMP had subjective bad faith in seeking the protection that the statute provided. And clearly, its invocation of that procedure has not, as of now, been shown to be futile. Indeed, the bankruptcy court found that there was a reasonable possibility of success in pursuing a § 524(g) plan. A trust has been created, as required by the statute, and the promise has been made for the equitable treatment of all asbestos claimants, both present and future.

Moreover, the suggestion that DBMP's pursuit of such a plan is futile is belied by the Supreme Court's observations in the recent decision of *Truck Insurance Exchange v. Kaiser Gypsum Co.*, 602 U.S. 268, 273 (2024). In *Truck Insurance*, the Court explained that Congress responded specifically to the challenge of asbestos liability and the unique latency of asbestos-related diseases in enacting § 524(g) of the Bankruptcy Code. It observed that § 524(g) "allows a Chapter 11 debtor with substantial asbestos-related liability to establish and fund a trust that assumes the debtor's" asbestos-related liability and that the section "channels all present and future claims into the trust by enjoining entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery for claims" that will be paid by the trust. *Id*. at 273–74 (cleaned up). The Court added that this scheme "ensure[s] that health claims

16

can be asserted only against the Trust and that [the company's] operating entities will be protected from an onslaught of crippling lawsuits that could jeopardize the entire reorganization effort." *Id.* at 274 (cleaned up) (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640 (2d Cir. 1988)).  In short, the Court recognized that circumstances such as those of DBMP are what § 524(g) sought to address.  Indeed, by its terms, § 524(g) applies to a debtor "likely to be subject to substantial future [asbestos-related] demands for payment."  11 U.S.C. § 524(g)(2)(B)(ii)(I).

Here, DBMP filed for bankruptcy due to substantial asbestos liabilities, as it had incurred over $2 billion to resolve hundreds of thousands of asbestos claims since 2002 and was still facing more than 60,000 asbestos claims, with more to come.  Thus, DBMP's efforts to pursue reorganization and address asbestos liability through a § 524(g) trust were consistent with the congressional purpose and design of that provision, and, as such, "the purposes of the Code would be furthered" by DBMP's bankruptcy petition.  *Carolin*, 886 F.2d at 701.  The Claimants have not contradicted these facts, which show an absence of futility.

The Claimants make much about the ability of Old CertainTeed, New CertainTeed, and DBMP to pay the asbestos claims without the need of filing a Chapter 11.  They characterize DBMP as a "profitable, non-distressed" company, suggesting that the use of Chapter 11 is somehow wrong in such circumstances.  But this fact is irrelevant to their bad faith argument.  The statutory authority for a company to pursue a § 524(g) plan in a Chapter 11 reorganization does not require a showing of "insolvency," *see* 11 U.S.C. § 524(g)(2)(B), which is in contrast to other provisions of the Bankruptcy Code, *see, e.g.*,

17

*id*. § 109(c) (requiring municipal debtors *to be insolvent* when pursuing a Chapter 9 proceeding). Rather, in enacting § 524(g), Congress recognized a different form of financial distress, explaining that companies in a situation like DBMP's face "lingering uncertainty in the financial community," which makes it more difficult for them to meet the needs for capital. H.R. Rep. No. 103-835 (1994), at 40. And, as it explained, this lingering uncertainty flows from the nature of asbestosis and mesothelioma, which can manifest themselves years after asbestos exposure. *See id*. Moreover, Congress was concerned not only about the ability of a company like DBMP to continue paying *future* claims, but also the fairness of those payments to future claimants, which could be undermined by the latency of the disease. These purposes are the stuff of bankruptcy and of § 524(g) in particular.

Our good colleague in dissent, however, rests his entire position finding bad faith on an underlying misunderstanding of the § 524(g) procedure. He repeatedly characterizes it as an unfair "scheme" by which Old CertainTeed, which was an "ultra-wealthy" corporation, was able "to evade asbestos-related" civil tort liability by creating a "shell" company "DBMP," assigning to it all asbestos liability, and then putting that company into bankruptcy. In this manner, he states, Old CertainTeed was able to "plunder[] that shell corporation" into bankruptcy. As he laments, Old CertainTeed was able "to place its asbestos-related civil tort claims involving those thousands of American workers behind the Bankruptcy Code's firewall of protection." *Post* at 40. And, he concludes, our opinion continues a "distressing march into being the 'safe harbor' for the 'big guys,'" by letting

18

Old CertainTeed act "through its stooge subsidiary, the Debtor DBMP . . . to avoid accountability for their asbestos-related tort liabilities." *Id*. at 58.

Regretfully, this argument completely misunderstands the § 524(g) process, which Old CertainTeed and New CertainTeed invoked here. And in invoking that process, Old CertainTeed and New CertainTeed did not protect *one single dollar from asbestos-related liability*. To the contrary, § 524(g) provided a procedure designed to collect all of Old CertainTeed's asbestos claims into bankruptcy and, from a required trust, pay those claims, both past and future. The § 524(g) process is quicker, more efficient, and fairer than can be provided by continuing with widely dispersed litigation in various federal and state courts. But more important, and not appreciated by the dissent, no asset from Old CertainTeed is protected from paying its asbestos claimants. After Old CertainTeed transferred its remaining assets to New CertainTeed, New CertainTeed entered into an *uncapped* funding agreement, committing *all of its assets* to payment of asbestos claims. Thus, while no assets are protected from asbestos liability, as the dissent erroneously recites, in bankruptcy those assets are managed more fairly, so that each claimant is given a fairer opportunity for compensation, *including future claimants*. This was Congress's considered design of § 524(g), and the dissent does not even acknowledge these various elements of fairness. And, of course, on this failure, it erroneously finds bad faith when § 524(g) is invoked.

We conclude that the district court properly held that, in considering and denying the Claimants' motions to lift the automatic stay under § 362(d), the bankruptcy court did not abuse its discretion. We have found no factual finding to be clearly erroneous and no

19

application of law to be in error such as would support a finding of abuse. *See T.H.E. Ins.*

*Co. v. Davis*, 54 F.4th 805, 818–19 (4th Cir. 2022).  Accordingly, we affirm.

AFFIRMED

KING, Circuit Judge, dissenting:

Slowly but surely — and to my great regret — our Circuit has become the "safe haven" for ultra-wealthy corporations seeking to evade asbestos-related civil tort liability under the guise of the Bankruptcy Code. *See, e.g.*, *Bestwall LLC v. Off. Comm. of Asbestos Claimants of Bestwall, LLC*, 148 F.4th 233 (4th Cir. 2025) (affirming denial of motion to dismiss for lack of subject matter jurisdiction Chapter 11 bankruptcy filed by debtor Bestwall seeking to evade asbestos-related tort liabilities); *In re Bestwall LLC*, 71 F.4th 168 (4th Cir. 2023) (affirming injunction extending protections of automatic stay to fully solvent non-debtor codefendant Georgia-Pacific for asbestos-related tort liabilities). Today's panel majority goes even one step further in cementing that unfortunate reputation.

In the underlying "bankruptcy" proceedings in the Western District of North Carolina, the Estate of deceased Air Force veteran Peter Bergrud (the "Bergrud Estate"), along with Michael and Ann Herlihy, sought very limited relief from an automatic bankruptcy stay interposed against any liquidation of their asbestos-related tort claims in our Nation's state courts against the so-called "Debtor" in bankruptcy, DBMP, LLC ("DBMP," the "Debtor," or the "Debtor DBMP"), its parent, CertainTeed Corporation, and other corporate entities. The Bergrud Estate and the Herlihys predicated their stay relief request on DBMP's well-documented and extensive "bad faith" surrounding its Chapter 11 bankruptcy — an effort that was initiated after CertainTeed executed an increasingly-common scheme to shed itself of civil tort liability for asbestos-related claims. That scheme involved, inter alia, CertainTeed undergoing a "Texas Two-Step" corporate makeover in the State of Texas, assigning all of its existing asbestos-related civil tort

21

liabilities to a newly formed front organization (that is, DBMP), and then plundering that shell corporation into a Chapter 11 bankruptcy in western North Carolina.[1]

Notwithstanding those and other damning facts, the bankruptcy court denied the Bergrud Estate's and the Herlihys's stay relief requests based on what can only be characterized as fundamental misapplications of law and fact. The district court upheld that flawed court ruling, and our panel majority now erroneously affirms. In my view, the majority's decision is not only inexplicable as a matter of law and fact, it is unacceptable.

As explained in further detail below, the Bergrud Estate and the Herlihys are statutorily entitled to the limited relief they seek because "bad faith" on the part of a debtor constitutes "cause" to lift the automatic bankruptcy stay imposed under 11 U.S.C. § 362(d). *See, e.g.*, *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 25 (2000). And there is ample evidence in this record that the Debtor DBMP and its non-debtor parent, CertainTeed, have engaged in pervasive, well-documented, and systematic bad faith by subverting the Bankruptcy Code to evade asbestos-related civil tort liability and deprive tens of thousands of dead and

---

[1] Contrary to the panel majority's view, such a divisional merger — effectuated pursuant to Section 1.002 (A)(55) of the Texas Business Organizations Code — is rightly called the "Texas Two-Step." And that term is not a pejorative moniker used only by those seeking to assail the corporate machinations that have occurred in the Lone Star State. Rather, it is the very term used by the lawyers who developed this scheme. *See, e.g.*, Jones Day, *The Year in Bankruptcy: 2023*, https://www.jonesday.com/en/insights/2024/01/the-year-in-bankruptcy-2023 [https://perma.cc/3ER8-BKH8] (last visited Jan. 16, 2026) (recognizing that "[a]lso prominent in the courts in 2023 was the propriety of the 'Texas Two-Step,' a corporate reorganization technique recently used by several prominent companies in combination with a bankruptcy filing to deal with mass tort liabilities"); Dan Levine & Mike Spector, *How a bankruptcy 'innovation' halted thousands of lawsuits from sick plaintiffs*, REUTERS (June 23, 2022) ("Four companies, led by one lawyer, have used the 'Texas two-step' to divert tens of thousands of lawsuits into bankruptcy court — without filing for Chapter 11 themselves.").

dying Americans of their constitutionally-protected day in court before a jury of their peers. Not only that, DBMP — as the Debtor opposing relief from the automatic bankruptcy stay being sought by the Bergrud Estate and the Herlihys under § 362(d) — has failed to carry its statutory burden of proof on the "bad faith" issue. *See* 11 U.S.C. § 362(g).

The panel majority's further diversions from § 362's statutory framework fare no better. That is, our Court's decisions in *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), and *In re Robbins*, 964 F.2d 342 (4th Cir. 1992), do nothing to salvage the majority's flawed view that the Bergrud Estate and the Herlihys are not entitled to automatic stay relief. In the same vein, my friends' consecration of the Debtor's Chapter 11 bankruptcy as being pursued in "good faith" — on grounds that the Debtor is seeking to "avail itself" of a so-called "§ 524(g) trust" to pay asbestos claims — makes no sense. *See ante* at 6.

* * *

It has long been established that bankruptcy courts are "court[s] of equity." *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984). Although the Supreme Court has since then cautioned that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code," *see Law v. Siegel*, 571 U.S. 415, 422 (2014) — in this precise situation, § 362 of Title 11 — the "essence of equity" remains: that is, bankruptcy courts have the power to "do equity and to mold each decree to the necessities of the particular case," *see Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Specifically, "bankruptcy court[s] ha[ve] the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in

23

administration of the bankrupt estate." *See Pepper v. Litton*, 308 U.S. 295, 308 (1939).

Put simply, bankruptcy courts — as courts of equity — must do what is right, just, and fair.

In this light, over 40 years ago, a very wise and able federal judge in Maryland, Judge Joseph H. Young, alerted us to the dangers of ultra-wealthy corporations abusing and manipulating the Bankruptcy Code for nefarious, subversive, and inequitable purposes:

> This Court has watched with alarm as major corporations have filed for Chapter 11 reorganization or threatened to file Chapter 11 petitions . . . to invoke the automatic stay provision to evade pending litigation. [T]he Court considers such practices to be a gross abuse of the bankruptcy proceedings. Chapter 11 [of the Bankruptcy Code] was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability. And the purpose of the automatic stay is to preserve a debtor's assets and permit an orderly, as opposed to chaotic, distribution or reorganization. *The automatic stay was not intended to grant defendants a last-minute escape chute out of pending civil litigation.*

*See Furness v. Lilienfield*, 35 B.R. 1006, 1009 (D. Md. 1983) (emphasis added).

Sadly, those well-explained and justified fears have now come to pass, and all fundamental notions of "equity" have been turned on their head. I wholeheartedly dissent.

I.

A.

As the panel majority emphasizes, CertainTeed Corporation — a highly profitable and going business concern — has for years faced "overwhelming liability," owing to its extensive use of asbestos in commercial products. *See ante* at 5 (citation modified). In that respect, the majority references what it says are astronomical numbers revealing CertainTeed's liability for thousands of civil tort claims. *Id.* at 4 (majority recognizing that

24

"CertainTeed paid out less than $10 million per year in asbestos-related claims in the 1990s, [and] since 2002, it has spent an average of $80 million per year in payments to resolve such claims, as well as an additional $20 to $30 million per year in legal defense costs").

Discounting the fact of CertainTeed's extremely solid financial footing, however, the panel majority also admits that, "[i]n the fall of 2019, CertainTeed determined that it would *take advantage* of the § 524(g) reorganization provision of the Bankruptcy Code[.]" *See ante* at 5 (emphasis added).[2]   And "take advantage" CertainTeed assuredly did — through a corporate sleight-of-hand called the "Texas Two-Step," CertainTeed has been able to rid itself of asbestos-related civil tort liabilities by creating its corporate alter ego, DBMP.  Even as the panel majority recounts, what happened in that regard is startling:

> To engage the process, CertainTeed split itself into two companies under Texas corporation law . . . by forming two new entities and assigning to them CertainTeed's liabilities and assets.  One corporation was called CertainTeed ("New CertainTeed") and the other, DBMP LLC, and under the procedure, the original CertainTeed (now "Old CertainTeed") ceased to exist.  In the divisional merger, Old CertainTeed assigned all of its asbestos liabilities to DBMP, as well as $25 million in cash and all the equity of a cashflow-producing siding and trim business, Millwork & Panel, which had projected earnings before taxes of $16 million in 2020 and an estimated fair market value of $150 million.  It assigned its remaining liabilities and assets to the New CertainTeed.  At the same time, DBMP and New CertainTeed entered into an *uncapped* funding agreement that obligated New CertainTeed to satisfy DBMP's asbestos-related liabilities and, in case of bankruptcy, to pay for all costs related to administering a Chapter 11 reorganization, including the cost of resolving asbestos-related claims through a trust under 11 U.S.C. § 524(g).  Under this agreement, none of Old CertainTeed's assets were

---

[2] Section 524(g) of Title 11 provides for the creation of a "trust" that, pursuant to a good faith Chapter 11 plan of reorganization, "is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products."

25

protected from liability to pay the asbestos claims, but those claims were isolated so that they could be managed under a § 524(g) plan.

After this division of liabilities and assets and the creation of the uncapped funding agreement, DBMP filed a Chapter 11 reorganization petition to avail itself of the § 524(g) process.

*See ante* at 5-6 (citation modified).

In recounting these disturbing events, my friends in the majority have overlooked important details related to CertainTeed's execution of the "Texas Two-Step" maneuver. Of note, CertainTeed's well-crafted and methodical plan to pursue a sham Chapter 11 bankruptcy — dubbed by CertainTeed's lawyers as "Project Horizon"— was a "closely guarded corporate secret . . . driven not by businesspeople, but by lawyers." *See* J.A. 230-31.[3]  Indeed, "Project Horizon" was an attorney-created and implemented strategy "[t]o facilitate [CertainTeed's] ability to pursue a [§] 524(g) resolution" in a bankruptcy court, "without subjecting the entire . . . enterprise to chapter 11." *Id.*  The "Project Horizon" plan, in turn, contemplated DBMP filing for bankruptcy in western North Carolina.

Consistent therewith, in July 2019, CertainTeed reserved the corporate name "DBMP, LLC" in the State of North Carolina.  Later in 2019, CertainTeed underwent the exhaustive corporate makeover called for by "Project Horizon."  To that end, on October 22, 2019, CertainTeed's parent — that is, a much larger international business enterprise called "Compagnie de Saint-Gobain," based out of France — formed a company called "CertainTeed Holding Corporation" ("CT Holding"), and thereupon contributed all issued

---

[3] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

and outstanding stock of CertainTeed to the newly-formed "CT Holding," in exchange for full ownership of CT Holding. That very same day, October 22, 2019, CertainTeed also transitioned from a Delaware corporation to that of a Delaware limited liability company.

The next day, October 23, 2019, at 9:00 a.m. CST, CertainTeed converted itself to a Texas limited liability company. Approximately 30 minutes later, CertainTeed effectuated its "Texas Two-Step." That is, CertainTeed split itself into two Texas limited liability companies: "New CertainTeed" and the Debtor here, "DBMP."[4] Subsequently, at 10:00 a.m. CST on October 23, CertainTeed — now free of its asbestos-related civil tort liabilities — converted back to a Delaware limited liability company. And then at 12:49 p.m. CST, DBMP converted to a North Carolina limited liability company. All told, the so-called "New" CertainTeed and DBMP were Texas corporate entities for less than four hours.

As a result of CertainTeed's "Texas Two-Step," the DBMP was "a mirror image" of the "Old" CertainTeed: "a fully operating company with all of Old CertainTeed's employees, the bulk of its assets and operations, and all of its non-asbestos creditors." *See* J.A. 219. But DBMP was also "quite different," having been "allocated 100% of . . . CertainTeed's . . . asbestos liabilities." *Id.* at 219, 234, 238. As the diagram below depicts:

---

[4] The corporate moniker of "New CertainTeed" is a complete misnomer. The only thing that is truly "new" about CertainTeed — following its effectuation of the "Texas Two-Step" in 2019 — was that it had rid itself of its existing asbestos-related civil tort liabilities. Accordingly, while the bankruptcy court, district court, and now the panel majority refer to CertainTeed as "New CertainTeed," I properly refer to that entity as "CertainTeed."

27



*Id.* at 236.[5]

As my friends in the majority acknowledge, CertainTeed and DBMP also executed a series of so-called "funding agreements" around that time. *See ante* at 5-6. Those agreements provided, inter alia, that CertainTeed would supply DBMP with all funds necessary to satisfy its asbestos civil tort liabilities, irrespective of whether DBMP was in or out of bankruptcy. Furthermore, the agreements did not call for any "loans" to DBMP from CertainTeed, they do not impose any repayment obligations on DBMP, and the amount of the payments by CertainTeed to DBMP are not monetarily "capped."

---

[5] This diagram was utilized by the bankruptcy court in these proceedings to "depict, in condensed form, the organizational structure before and after" CertainTeed's Texas Two-Step maneuver in October 2019. *See* J.A. 236. Although complicated at first blush, the diagram reflects that, following its Texas Two-Step, CertainTeed's corporate structure remained largely intact — that is, the company was still a subsidiary of the French-based "Compagnie de Saint-Gobain," and it yet possessed 97% of CertainTeed's viable assets and operating liabilities. Notably, the primary difference was that CertainTeed's "bad" liabilities — i.e., its entirely manageable asbestos liabilities — were now confined to DBMP, who would soon be the Debtor in this Chapter 11 bankruptcy.

28

Furthermore, in light of the circular "funding agreements," the Debtor DBMP and CertainTeed have "steadfastly" maintained throughout these Chapter 11 proceedings that the Debtor "has the same ability to fund the costs of defending and resolving present and future asbestos claims, both in the state and federal courts and in connection with any chapter 11 filing." *See* J.A. 237-38. And the agreements otherwise "make[] available [CertainTeed's] and DBMP's combined resources from [pre-divisional merger CertainTeed] — giving DBMP the ability to meet its obligations, including paying asbestos claims." *Id.* at 1068 (citation modified). Put differently, the agreements between CertainTeed and the Debtor are much like an ATM that the Debtor can access at any time to satisfy all of its supposedly "overwhelming" asbestos-related civil tort liabilities.

## B.

### 1.

Shortly after being formed out of "whole cloth,"[6] DBMP filed its voluntary petition for bankruptcy in the Western District of North Carolina in January 2020, purporting to do so under Chapter 11 of the Bankruptcy Code. The Debtor DBMP's bankruptcy filing triggered an application of the automatic stay under 11 U.S.C. § 362(a). Around that time, the Debtor's ultimate parent — Saint-Gobain — announced to investors that it expected the bankruptcy would "take up to approximately five to eight years," would provide the Debtor "with the time and protection to negotiate an agreement to be approved on behalf

---

[6] When something is formed out of "whole cloth," it is simply made up. *See, e.g.*, William Safire, *On Language; Out of the Whole Cloth*, N.Y. TIMES MAG. (July 19, 1998), https://www.nytimes.com/1998/07/19/magazine/on-language-out-of-the-whole-cloth.html [https://perma.cc/AN7V-M6Y7].

29

of all claimants and by the court," and would result in "all asbestos litigations [being] stayed and all related costs suspended." *See* J.A. 437. And Saint-Gobain related that the bankruptcy was imperative due to "increasing risks . . . in the US tort system." *Id.*

In 2021, the bankruptcy court granted the Debtor DBMP's motion to preliminarily enjoin all litigation against CertainTeed, thereby extending to that fully-solvent entity — which, under "Project Horizon," purposefully did not file for Chapter 11 bankruptcy — the immense protections of the automatic bankruptcy stay. The court reasoned that allowing continued civil asbestos litigation and collection against CertainTeed would be tantamount to a dismissal of the Debtor's bankruptcy. The court explained, however, that despite enjoining those tens of thousands of asbestos-related lawsuits, it was not ruling on any issue of "bad faith," nor on a motion to dismiss the Debtor's bankruptcy. *See* J.A. 260.

Of especial relevance here, in affording preliminary injunctive relief to the non-debtor CertainTeed, the bankruptcy court made a series of factual findings regarding CertainTeed's conduct in undertaking the "Texas Two-Step" to only then plunder the Debtor DBMP — fully loaded with CertainTeed's existing asbestos-related liabilities, but nevertheless backed by the limitless "funding agreements" — into bankruptcy:

- CertainTeed was "[s]eeking a less expensive way of dealing with these tort liabilities" from claims filed by asbestos plaintiffs;

- The Debtor DBMP's Chapter 11 bankruptcy was a long-formulated plan that started in February 2018, was code-named "Project Horizon" and was "an attorney-created and implemented strategy '[t]o facilitate [CertainTeed's] ability to pursue a § 524(g) resolution' in bankruptcy 'without subjecting the entire . . . enterprise to [C]hapter 11'";

- "CertainTeed never entertained a bankruptcy filing for itself and all of its subsidiaries and affiliates . . . . This was a profitable going concern whose

30

assets significantly outweighed its combined operating and asbestos liabilities. For such an enterprise, a bankruptcy filing would have serious negative consequences"; and

- "Rather[] than file . . . CertainTeed or the CertainTeed Enterprise in bankruptcy, the Project Horizon plan was to isolate the asbestos liabilities in a single affiliated corporation and file it in [C]hapter 11."

*See* J.A. 229-32.

2.

In April 2024, the Bergrud Estate and the Herlihys sought relief in the bankruptcy court from the automatic stay, pursuant to 11 U.S.C. § 362(d).[7] Predicated on allegations of the Debtor DBMP's "bad faith" underlying the filing of its Chapter 11 petition, the Bergrud Estate and the Herlihys pursued circumscribed relief from the automatic stay, seeking only to quantify their state-law civil tort claims against the Debtor and CertainTeed before juries of their peers in California and Washington. Notably, to this very day, the Bergrud Estate and the Herlihys are the only creditors in these bankruptcy proceedings that have sought such § 362(d) relief from the automatic stay from the bankruptcy court.

Therein, the Bergrud Estate and the Herlihys maintained that the Debtor DBMP is not — and never has been — in financial distress. Indeed, the Debtor has admitted, throughout these proceedings, that it is able to pay all asbestos creditors in full outside of bankruptcy. The Bergrud Estate and the Herlihys asserted that the "Texas Two-Step" —

---

[7] Section 362(d) of Title 11 provides, in relevant part, that "[o]n request of a party in interest and after notice and a hearing, the court *shall* grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . (1) *for cause*, including the lack of adequate protection of an interest in property of such party in interest[.]" *See* 11 U.S.C. § 362(d) (emphasis added).

31

which strands a single class of creditors (i.e., civil tort plaintiffs) to pursue their claims in bankruptcy, yet shields all other creditors and 97% of CertainTeed's profitable business operations from the obligations of a bankruptcy — confirmed that the Debtor was using Chapter 11 as an improper litigation tactic to impede state-law asbestos liability trials for more than 60,000 plaintiffs that DBMP was fully able to pay vis-à-vis the endless "funding agreements" backed by CertainTeed.  The Bergrud Estate and the Herlihys thus maintained that the Debtor's bankruptcy does not serve the Bankruptcy Code's purpose of resuscitating a financially distressed entity, and was thus undertaken in "bad faith," justifying an award by the bankruptcy court of what is called "for cause" relief from the bankruptcy stay.

C.

1.

In May 2024, the bankruptcy court — ruling from the bench — denied the strikingly limited stay relief sought by the Bergrud Estate and the Herlihys.  The court primarily based its ruling on two of our Court's decisions — *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989) (specifying that "both objective futility and subjective bad faith be shown in order to warrant dismissal[] for want of good faith in filing" under 11 U.S.C. § 1112), and *In re Robbins*, 964 F.3d 342, 345 (4th Cir. 1992) (recognizing, in context of good-faith bankruptcy, three factors that must be established to demonstrate statutory "cause" for lifting automatic bankruptcy stay).  Against that backdrop, the court explained as follows:[8]

---

[8] My settled preference — as a matter of legal writing that makes any sense — has been to avoid the use of lengthy "block quotations" in opinions.  In this situation, however,

(Continued)

32

[T]he first order of business is what to do with the Bergrud and Herlihys'[s] motions for relief from stay. So I guess I get to start out by boring you with long talk, but here's where we are.

Both have relief from stay motions. It probably won't surprise anyone that I think that the motions have to be denied for the reason that we've had substantially identical requests for relief that I think have been entertained at least four times between the three so-called "two-step" cases in this District and on each occasion the motions were denied.

Back at the outset of this case we had a motion by the [Committee of Asbestos Claimants] for relief from stay and in conjunction with the preliminary injunction and on August the 12th I entered Findings and Conclusions at that time that did a number of things, but effectively, with regard to the relief from stay, denied the request. The [Committee] then was seeking relief to permit all 60,000 plus claimants, or however many there are, to individually liquidate their tort claims, both against the Debtor and as against the new company, New CertainTeed, in the tort system.

My ruling then was premised on three or four different points. First, that there wasn't cause to, to grant relief from stay because it would greatly prejudice the estate and the harm to the Debtor and its estate would outweigh any hardship occasioned to the asbestos claimants, which was almost entirely delay harm; that causing the tort system to be flooded with asbestos cases, even as the chapter 11 case remained pending wouldn't serve judicial economy and in fact, that the asbestos claims arose under state law didn't support relief from stay because it involved individual claimants getting their claims determined in state court as opposed to in the bankruptcy case; that it also would imperil the ability for the Court to treat consistently and fairly all similarly situated claimants in a 524(g) plan, particularly those that are future claimants; and that to grant relief from stay would, would effectively destroy the bankruptcy case. There would be no chance of a successful reorganization. It would be, effectively, tantamount to dismissal of the chapter 11 case and without meeting the standards for a bad faith dismissal under the *Carolin* case.

I noted then that delay itself is not generally considered to be a reason to grant relief from stay because it takes time to work through the bankruptcy process and get a, a confirmed plan and that if there was delay, that

---

a detailed recounting of the bankruptcy court's May 2024 bench ruling is warranted, in order to accurately depict the specified "bases" of the court's challenged reasoning.

bankruptcy was not the only forum that presented a prospect, that effectively the state court system with so many cases that were filed more than ten years ago also involves delay, given the number of these claims, but that, on the other hand, if there was good faith and cooperation, that the parties might actually be faster in bankruptcy by, by agreeing on a number and treatment under a trust and plan.

Back then, the [Committee of Asbestos Claimants], and now the movants, decried the Texas two[-]step  and the follow-on bankruptcy as being, per se, a fraud perpetrated by the Debtor's predecessors against the asbestos claimants.  Of course, the Debtor and those allied with the Debtor deny this. They say they're in bankruptcy just to access the trust mechanisms offered under 524(g) and those are only available in chapter 11 and they also say they plan to pay every meritorious claim, that effectively, they believe this would be fairer and more efficient because they wouldn't be paying bogus claims because it's too expensive to try the cases to verdict.

Back then when we were talking about this, the [Committee of Asbestos Claimants] wanted to allow the claimants to attack [CertainTeed] as well. That was problematic for a variety of reasons, not just the interference with the reorganization, but also legally because the individual claimants were then talking about pursuing for their individual benefit claims that we would consider in the Fourth Circuit first crack avoidance claims and that would interfere with the bankruptcy resolution of those claims.  Now I don't see that in the present motion, but I wasn't entirely clear whether that was in the back of someone's mind.

But for whatever reason, I have since recognized there is, in fact, an estate claim there. There's a right for creditors to challenge the divisional merger and with the Debtor in bankruptcy, under Circuit precedent those estate claims had to be prosecuted by the estate and I've since allowed the [Committee] to assert and they have asserted those claims. So granting relief from stay on a wholesale basis would undermine the effort.

So that was the reason the [Committee's] motion was denied.

. . .

But here we are again. Rounds 2 and 3 in the DBMP case with the same firm pressing the same rejected relief and theories and it will not surprise you that I'm denying the motions again.  I'd say nothing really has changed since my first ruling in this case with, on the [Committee of Asbestos Claimants'] motion.  It looks like maybe trying out the new relief from stay arguments on

34

a different judge . . . I believe under *Carolin* if we're going to start granting relief from stay en masse, then you're back under *Carolin* and we can't on the basis of subjective bad faith, if that exists, warrant, effectively, tubing the whole case. That's to do, effectively, indirectly what I am not permitted to do directly.

Now the movants have suggested that thinking that there's an avalanche of motions coming is speculative, but I would disagree with all that. I disagreed before. I've presided over now, I think, a half dozen or maybe eight asbestos cases and been doing this for a decade and while I don't know as much as all of you about those cases, I would say that from what I've experienced it is an absolute certainty that to grant these two motions would lead to hundreds, if not thousands, [or] more.

As we all know, there are thousands and thousands of claimants, but most of them are represented by a dozen or so asbestos firms across the country, firms that are knowledgeable about bankruptcy law, well informed about what's going on in each of these cases, many serving on the [Committee of Asbestos Claimants] indirectly, and are creditor firms that are aggressive in representing their clients and protecting their rights. The firms have heavy influence over voting. Just witness the *Garlock* and *Kaiser* case. The claimants were all opposed to the Debtors' proposal, but when a deal was struck with the [Committee] in, in those cases the result became a, almost a hundred-percent vote in favor. And all of that experience tells me that if I were to grant these two motions for relief from stay, even just to liquidate the claims, by month's end I'd have dozens of claimants making the motions and by the end of the summer there'd be tens of thousands.

So my prior ruling and reasoning in the [Committee of Asbestos Claimants] relief from stay matter and the dismissal matters, especially the denial of dismissal, I'm readopting here today.

. . .

I do want to say a couple words about specific arguments that were raised just for the benefit of a reviewing court, if there is one. The movants are saying that the two[-]step in bankruptcy were . . . undertaken in subjective bad faith. I don't feel comfortable making that conclusion today, not on this record or at this stage in the case. That same basic argument was made in the manufacturing jurisdiction and [preliminary injunction] arguments in *Bestwall*, and, as you know, the District Court and then the Fourth Circuit effectively rejected those. The Panel even scolded the claimants for delaying the bankruptcy case and the Fourth Circuit didn't overturn their ruling. And

35

since then. Judge Beyer and I both have encouraged direct appeals of our dismissal rulings to the Circuit, but twice those have been denied.

It is obvious that the [Committee of Asbestos Claimants] thinks that if a profitable conglomerate breaks off part of itself to use chapter 11, that's, per se, bad faith and that the filing, a filing to overcome the tort system is a fraud, but the Debtors think just the opposite, that this is an efficient way of dealing with an intractable problem. And by the way, they owe less than what the claimants think and they think they've been abused by bogus claims in the tort system. The Debtors also maintain they intend to pay all allowed claims. They just don't think they owe as many of them.

So they, from their vantage point, say they're not just stranding the asbestos claims. And it's, of course, true that they'd like a capped plan. Every asbestos debtor to date practically has and they'd like to avoid punitive damage awards, etc., etc., and they'd like to protect their affiliates. But there's nothing new about any of that. Are those aspirations, per se, bad faith? It seems to me that right now the Fourth Circuit doesn't seem to, nor does our District Court.

I've mentioned the differences of opinion about whether a non-distressed solvent company can use bankruptcy tools. In the *Aldrich* order denying dismissal, I gave you my take about where I see the landscape and the potential issues lying ahead. No change there today because a higher court than this one will ultimately make the call. But can I find today that this filing is subjective bad faith because it's sought by a solvent non-distressed entity and does that dismiss, justify dismissal? I'd say the answer in this Circuit at the moment appears to be no.

And moreover, we are currently litigating the propriety of the, of the divisional merger and the bankruptcy filing in the adversary proceedings and whether those events were detrimental to creditors. And that also cautions against trying to determine the same matters, like subjective bad faith in this current motion. But even if subjective bad faith lies, I don't think it's the standard. At most, it's a factor. The standard for relief from stay is cause and the controlling case in our Circuit is *Robbins*. *Robbins* involves a balancing test and . . . here relief from stay would lead to case dismissal, which under *Carolin* is not attainable for simply subjective bad faith.

So I'm not going to try to do indirectly something that I'm not permitted to do or not inclined to do under existing law. I am bound by the *Carolin* decision.

36

Now movants seem to think the Court invited this motion. I didn't. I try to listen to the issues that y'all present and consider the evidence and make the findings from, that support the decisions and answer the questions fairly. On occasion, I have been known to talk a little longer than shorter because I think in some ways it helps you on trying to understand how your jury is seeing the case as it goes along and maybe helps you on settlement grounds.

But bottom line is the Court's not on anybody's side. I'm not an activist and I'm not trying to engineer any particular result. On the facts found in the PI ruling, I held that the bankruptcy stay applied, that dismissal wasn't permitted, and the third-party injunction was required. That's a preliminary ruling, but that's what I thought and that hasn't changed today.

There were some more arguments that were just rehashes of arguments previously made and rejected in the [preliminary injunction] and the [Committee of Asbestos Claimants] relief from stay motions as well as in the two cases, like arguing that *Premier* is the standard, not *Carolin*. I'm not going to go back through all of that, again. But I would say this. We've been through this at least four times. Repeating this exercise for different claimants with the same identical legal posture is a waste of everyone's time. It's not very likely to work and your vexation of not being able to get to the Circuit or getting a ruling that you like doesn't justify increasing your opponent's costs and everyone's workload.

So . . . I would suggest not continuing to try to beat your head against a rock. That's not going to change the outcome, but it could end up with you being sanctioned for pressing the same rejected theories time and again. So we've got enough problems to deal with and I'm just going to leave that as a word to the wise, recognizing that my time here is short.

So bottom line is the motions are denied. I would call upon the opponents, the Debtors primarily, to draw a short order that just makes reference to the verbal findings and conclusions and run it by everyone else for comments and send it on down.

*See* J.A. 913-25.

As a threshold matter, astonishingly absent from the bankruptcy court's bench ruling denying relief from the automatic stay was any consideration or discussion of the adverse impacts thereof on the Bergrud Estate or the Herlihys. And that ruling was being made by

37

a bankruptcy court of the United States — which had been created to be a "court of equity."

*See, e.g.*, *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984).  Rather, a major part

of the court's decision denying relief from the stay was an implicit but clear threat — set

forth in the penultimate paragraph of the above quotation — directed to the lawyers

representing the Bergrud Estate and the Herlihys.  Those lawyers were advised by the court

that they might be "sanctioned for pressing the same rejected theories time and again . . .

and I'm just going to leave that as a word to the wise[.]"  *See* J.A. 924-25.[9]

Distilled to its core on the merits, the bankruptcy court in its bench ruling declined

to directly resolve the issue concerning the Debtor DBMP's "bad faith" in the context of

the stay relief sought by the Bergrud Estate and the Herlihys.  Instead, the court stated that

such a ruling would allow "unfettered litigation" and "collection" against CertainTeed, and

---

[9] For the record, the motions being addressed by the bankruptcy court were the first and only such motions pursued by the lawyers for the Bergrud Estate and the Herlihys in this case.  And those lawyers, as we all well know, were obliged to represent their clients vigorously, and to the very best of their ability.  We always respect the work of such court officers, and those individuals were entitled to believe that their clients were best served by the relief being sought.  That they might be sanctioned by a bankruptcy court of the United States for being zealous advocates was an unwarranted and regrettable threat, and it is also contrary to the Rules of Professional Conduct that govern our profession:

> A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience . . . and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor.  A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.

*See* Model Rules of Professional Conduct, Rule 1.3[1].  Otherwise, the stay relief request presented here by the lawyers for the Bergrud Estate and the Herlihys was simple — authorize our dead and dying clients to exercise their right to sue the Debtor, CertainTeed, and its affiliates for civil torts in the Washington and California state courts.

38

would be the "functional equivalent" of a dismissal of the bankruptcy under 11 U.S.C. § 1112. *See* J.A. 921 (bankruptcy court stating that it "[didn't] feel comfortable making that conclusion today," regarding issue of Debtor's "bad faith"). Without explaining how a quantification of the Bergrud Estate's and the Herlihys's asbestos tort claims — and then authorizing their return to the bankruptcy court — would equate to such a "dismissal" of the Debtor's bankruptcy, the court simply speculated. It surmised that (1) lifting the automatic bankruptcy stay for the Bergrud Estate and the Herlihys would result in hundreds or thousands of additional similar motions; (2) that the court would be required to grant all of those hundreds or thousands of motions; and (3) that such an outcome would "defeat the purpose of the bankruptcy case, and . . . be akin to dismissal." *Id.* at 918.

## 2.

The Bergrud Estate and the Herlihys then appealed the bankruptcy court's stay denial ruling to the district court. In October 2024, the district court affirmed the bankruptcy court. In the district court's view, the bankruptcy court did not "abuse its discretion under *Robbins*." *See* J.A. 1196. Although recognizing that "bad faith" in filing a bankruptcy proceeding is a valid ground for lifting an automatic stay, the district court failed to address whether the Debtor DBMP had filed its Chapter 11 petition in bad faith. Nor did the court explain how the automatic stay relief sought by the Bergrud Estate and the Herlihys (i.e., limited relief from stay to quantify, but not collect, on their civil tort claims) would be an "effective dismissal" of the Debtor's Chapter 11 bankruptcy.

39

D.

The impact of these highly suspect corporate maneuverings by CertainTeed — an enormously profitable business enterprise, acting at the behest of its French parent corporation, Saint-Gobain — and the Debtor DBMP cannot be overstated. And put simply, that impact was and is devastating. As the panel majority acknowledges:

> As the result of the Chapter 11 bankruptcy filing, all asbestos-related state law tort claims against DBMP were automatically stayed pursuant to 11 U.S.C. § 362(a), and the bankruptcy court, in addition, entered a preliminary injunction that prohibited claimants from bringing asbestos claims against New CertainTeed, affiliated entities, and Old CertainTeed's distributors.

*See ante* at 6-7. Specifically, approximately 60,000 asbestos-related civil tort lawsuits — 32,000 being actively litigated in our Nation's courts — are now stayed by the Debtor DBMP's sham Chapter 11 bankruptcy in the Western District of North Carolina.

In other words, tens of thousands of pending civil tort suits in state and federal courts across our Country — initiated by plaintiffs who are suffering and dying from mesothelioma and other diseases caused by asbestos-riddled products of CertainTeed — are at a screeching halt. And that is so because a financially healthy and fully solvent corporation (i.e., CertainTeed) has now been authorized by three federal courts to place its asbestos-related civil tort claims involving those thousands of American workers behind the Bankruptcy Code's firewall of protection. Furthermore, despite enjoying the immense

40

benefits of the Debtor DBMP's bankruptcy filing, CertainTeed is not undergoing any of the scrutiny, transparency, and risk that a Chapter 11 bankruptcy should entail.[10]

The panel majority spills much ink discussing the "impacts" on CertainTeed and the Debtor DBMP. But what about the American workers suffering from the scourge of deadly diseases that were caused by their exposure to CertainTeed's asbestos-riddled products, and who otherwise simply want their day in court? Like the bankruptcy court, the majority has not even discussed those harrowing equitable aspects of these proceedings.

Of relevance to this appeal, claimant and movant Peter Bergrud — a military veteran who served our Country in the Air Force — began a decades-long career in the construction industry in the State of Washington in the 1960s. To that end, Mr. Bergrud routinely cut,

---

[10] Because of the foregoing facts, the Debtor DBMP's Chapter 11 bankruptcy should never qualify as a "bankruptcy," under a faithful application of Article I of the Constitution. *See, e.g.*, *Bestwall LLC v. Off. Comm. of Asbestos Claimants of Bestwall, LLC*, 148 F.4th 233, 246-59 (4th Cir. 2025) (King, J., dissenting). As explained therein, the recent string of Texas Two-Step bankruptcies in our Circuit — specifically, in western North Carolina — is "a far cry from the bankruptcy system that the Founders envisioned when they constitutionally authorized Congress to create 'uniform Laws on the subject of Bankruptcies.'" *Id.* at 247 (quoting U.S. Const. art. I, § 8, cl. 4). Rather, "[a]t the time of the Founding [in 1789], the protections of bankruptcy were available only to debtors who were truly bankrupt — that is, those unable or unwilling to pay their debts." *Id.* As a result of those historical facts and the tradition of the term "bankruptcies," "nothing in the Constitution permits Congress, or the federal courts, to allow a bankruptcy to be wielded as a strategic weapon by the powerful to avoid accountability to the harmed[.]" *Id.*

Regrettably, our en banc Court recently denied the validity of my above-recited view. *See Bestwall LLC v. Off. Comm. of Asbestos Claimants of Bestwall, LLC*, 157 F.4th 579 (4th Cir. 2025). As a result, the precedent in this Circuit precludes our determination that DBMP's Chapter 11 bankruptcy is unconstitutional under Article I of the Constitution. *See, e.g.*, *McMellon v. United States*, 387 F.3d 329, 334 (4th Cir. 2004) (en banc). Perhaps the Supreme Court will consider the matter and end such deceptive "bankruptcies."

beveled, and drilled CertainTeed's asbestos-cement pipe. Many years later, in 2019, Mr. Bergrud was diagnosed with — and then died from — his affliction by mesothelioma. A post-mortem examination revealed asbestos in Mr. Bergrud's lung tissue. Shortly after his death, Mr. Bergrud's Estate sued CertainTeed in a Washington state court in April 2019.

Meanwhile, claimant and movant Michael Herlihy worked for a California saw sharpening company from the mid-1980s until the mid-1990s. One of his employer's primary customers was the CertainTeed plant in Riverside, where CertainTeed manufactured its asbestos-cement pipe from 1965 through the early 1990s. Much like the late Mr. Bergrud, Mr. Herlihy regularly breathed "dust cake" from the saw blades used to cut asbestos-cement pipe at CertainTeed's Riverside facility. In March 2023, Mr. Herlihy was diagnosed with mesothelioma. Mr. Herlihy — who is yet living and suffering — and his wife, Mrs. Ann Herlihy, sued CertainTeed in a California state court in August 2023.

Beyond Mr. Bergrud and Mr. Herlihy, tens of thousands of other victims of CertainTeed asbestos are suffering the same debilitating fate. They are dying of mesothelioma — a rare and incurable cancer caused almost exclusively by asbestos exposure — and other diseases, but their civil lawsuits have been placed on ice nationwide by bankruptcy proceedings in North Carolina. And it is those dying and suffering victims — not the corporate lenders or institutional creditors of a normal bankrupt corporate entity — who constitute 97% of the creditors in the Debtor DBMP's Chapter 11 bankruptcy. They "are . . . ordinary and hardworking Americans who have spent their workdays installing drywall, laying insulation, cutting pipe, and then simply returning to their homes." *See Bestwall LLC v. Off. Comm. of Asbestos Claimants of Bestwall, LLC*, 157 F.4th 579, 581

42

(4th Cir. 2025) (King, J., dissenting from denial of rehearing en banc).  Moreover, "[t]hey are factory workers, veterans, tradespeople, and laborers," and "[t]hey are also the widows, adult children, and family members of thousands of [CertainTeed's] and [DBMP's] deceased victims, seeking to pursue tort claims in the civil courts on behalf of their loved ones who have died or are suffering from harrowing asbestos-related diseases."  *Id.*

## II.

Against this compelling backdrop, my friends in the majority erroneously rule that the bankruptcy court properly denied the requests of the Bergrud Estate and the Herlihys for relief from the automatic stay.  In so doing, the majority has recited what it says are issues not "before us" in this appeal:  (1) "any motion to dismiss the Chapter 11 petition so as to challenge whether Chapter 11's § 524(g) reorganization procedure has been appropriately invoked in this case"; (2) "the question [of] . . . whether the pre-bankruptcy Texas Two-Step process is appropriate or legal"; or (3) "the more fundamental question of whether Congress had constitutional authority to enact § 524(g) without requiring a showing of 'insolvency.'"  *See ante* at 10.  Rather, the majority proclaims that, "in this *presumptively* viable Chapter 11 proceeding, we address only the standard for lifting a § 362(a) stay and whether the district court correctly applied that standard."  *Id.*

By those limitations, however, my friends have avoided addressing their stated issue "head on."  Although they recognize that 11 U.S.C. § 362(d) supplies the standard for assessing whether relief from the automatic stay is warranted, the majority did not apply that simple framework here.  Instead, invoking our Court's inapposite decision in *In re*

43

*Robbins*, 964 F.2d 342 (4th Cir. 1992), the majority erroneously proclaims that affording the Bergrud Estate and the Herlihys limited § 362(d) relief from the automatic bankruptcy stay was not appropriate because doing so would "greatly prejudice" the Debtor DBMP's bankruptcy "goals," and that "such harm would outweigh any harm to the Claimants that might be caused by any delay in the resolution of their asbestos claims." *See ante* at 12.

From there, and to further distract from § 362(d)'s plain text, the majority turns to our 1989 decision in *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989) — another wholly inapplicable precedent — for the proposition that the Bankruptcy Code must be considered in some "larger context." *See ante* at 14. The majority then concludes that, because the Debtor DBMP invoked 11 U.S.C. § 524(g) — a tool that allows debtors facing overwhelming asbestos-related tort liabilities to form a trust to pay multiple claims — its Chapter 11 petition must be "*presumptively* viable," *id.* at 10, such that no further inquiry into the Debtor's "bad faith" in filing a Chapter 11 bankruptcy petition is warranted.

III.

In these circumstances, I disagree with the majority's affirmance of the bankruptcy court's erroneous decision. And that is so for at least three sound reasons.[11]

---

[11] The panel majority has not articulated the standard of review that guides its analysis. That notwithstanding, our Court has recognized that "[a] decision to lift the automatic stay under section 362 of the [Bankruptcy] Code is within the discretion of the bankruptcy judge" and "may be overturned on appeal only for abuse of discretion." *See Robbins*, 964 F.2d at 345. Of course, an error of law is an abuse of discretion that warrants reversal. *See Wudi Indus. (Shanghai) Co., Ltd. v. Wong*, 70 F.4th 183, 190 (4th Cir. 2023).

First, the majority ignores the plain statutory text of 11 U.S.C. § 362(d), which supplies the appropriate — and only — framework for assessing whether relief from the bankruptcy court's automatic stay is warranted. And applying that framework here, the Bergrud Estate and the Herlihys are entitled to relief from the stay because: (1) bad faith (or, a lack of "good faith") is "cause" for obtaining relief from the automatic stay, *see Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 25 (2000); (2) a bankruptcy petition is filed in "bad faith" when it does not further "the purposes of the [Bankruptcy] Code," which are primarily to "[r]esusitat[e] a financially troubled debtor," *see Bartenwerfer v. Buckley*, 598 U.S. 69, 72 (2023); and (3) the Debtor DBMP's bankruptcy is being pursued in "bad faith" because it does not further any purpose of the Code. Otherwise, the Debtor DBMP has failed to meet its § 362(g) burden of disproving bad faith — i.e., by establishing that there is "good cause" for the automatic stay imposed on the Bergrud Estate and the Herlihys.

Second, the panel majority is wrong to affirm on the ground that the bankruptcy court correctly applied *In re Robbins*, 964 F.2d 342 (4th Cir. 1992). To be sure, *Robbins* merely articulates the test for ascertaining what constitutes the statutory "cause" in the context of a good faith bankruptcy — i.e., when a debtor has not manipulated and exploited the Bankruptcy Code for nefarious subversive purposes — for lifting an automatic bankruptcy stay, pursuant to 11 U.S.C. § 362(d). But even applying *Robbins*, the Bergrud Estate and the Herlihys are yet entitled to relief from the automatic bankruptcy stay.

Third, the majority's effort to distort the reality of this case by way of our *Carolin* precedent and 11 U.S.C. § 524(g) is as circular as it is illogical. It makes no sense to conclude that the Debtor has been acting within the contours of a legitimate Chapter 11

45

bankruptcy — because it is seeking a "reorganization" to establish a § 524(g) trust — without first addressing the "bad faith" that already infects its Chapter 11 bankruptcy petition. Again, the majority overlooks the issue of "bad faith" by burying its head in the sand and ruling that the Debtor's invocation of § 524(g) — a tool for debtors in Chapter 11, rather than an underlying purpose for pursuing bankruptcy — can save the day.

A.

1.

Starting off, the panel majority's decision constitutes a novel and provocative departure from the plain text of the Bankruptcy Code provision that governs an assessment of whether relief from the automatic bankruptcy stay is warranted. That provision unambiguously provides that relief from the automatic stay must be afforded "for cause":

> [o]n request of a party in interest and after notice and a hearing, the court *shall* grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . (1) *for cause*, including the lack of adequate protection of an interest in property of such party in interest[.]

*See* 11 U.S.C. § 362(d) (emphasis added). Separately, and of great importance here, "[i]n any hearing under subsection (d) . . . of this section concerning relief from the stay of any act under subsection (a) of this section . . . (2) the *party opposing such relief has the burden of proof on all other issues*." *Id.* § 362(g)(2) (emphasis added). As such, DBMP, as the non-moving Debtor, was obliged to shoulder the burden of proof under § 362(g), and to demonstrate that its Chapter 11 bankruptcy was not being pursued in "bad faith." To put it another way, DBMP had the obligation of proving that it has been acting in "good faith."

46

Although the majority recognizes the applicability of the § 362 statutory framework, it has, like the underlying courts, failed and refused to apply it. Parting ways with my friends, I would apply the § 362(d) framework and rule that the Bergrud Estate and the Herlihys are entitled to relief from the automatic stay. And that is because the Bergrud Estate and the Herlihys have not only presented "cause" sufficient to support such relief (i.e., the Debtor's pervasive bad faith), but also because DBMP — as the Debtor opposing relief — failed to carry its burden of disproving "bad faith." *See* 11 U.S.C. § 362(g)(2).

To that end, as multiple courts of appeals have observed, a showing of "bad faith" is sufficient cause for lifting the protections afforded to a debtor by the automatic stay. *See, e.g.*, *In re Laguna Assocs. Ltd. P'ship*, 30 F.3d 734 (6th Cir. 1994), *as amended on denial of reh'g and reh'g en banc* (Sept. 9, 1994) (recognizing that "a debtor's lack of good faith in filing a petition for bankruptcy may be the basis for lifting the automatic stay"); *In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986) (specifying that "[t]he debtor's lack of good faith in filing a bankruptcy petition has often been used as cause for removing the automatic stay"); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071-72 (5th Cir. 1986) (recognizing that lack of good faith is "cause" for lifting stay to permit foreclosure). Beyond those authorities from our sister circuits, this Court has also recognized as much, emphasizing that "§ 362(d)(1)'s 'for cause' language authorizes the [bankruptcy] court to determine whether, with respect to the interests of a creditor [(i.e., the Bergrud Estate and the Herlihys)] seeking relief [from the stay], a debtor [(i.e., DBMP)] has sought the protection of the automatic stay in good faith." *See Carolin*, 886 F.2d at 699 (citation modified).

47

Perhaps most notably, the Supreme Court has recognized that a finding of "bad faith" — i.e., a lack of "good faith" — constitutes "cause" for automatic stay relief. *See Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 25 (2000) (explaining that "lack of good faith" on part of evasive debtor constitutes grounds for lifting automatic stay "for cause" under 11 U.S.C. § 362(d) (citing, inter alia, 3 Collier on Bankruptcy ¶ 362.07[6][a], at 362-101 to -102 (15th ed. rev. 2000) (specifying that bad faith commencement of bankruptcy justifies lifting automatic stay))). Tellingly, Justice Souter's unanimous decision in *Raleigh* references a highly relevant example of when relief from the automatic stay is warranted — when the debtor's bankruptcy filing was simply an effort to avoid other ongoing legal proceedings. *Id.* (citing *IRS v. Bacha*, 166 B.R. 611, 612 (Bnkr. D. Md. 1993)).

## 2.

Against this backdrop, it is clear that the Debtor DBMP — backed by the full faith and credit of CertainTeed, through the so-called "funding agreements" of the "Project Horizon" plan — was not, and never will be, in any financial distress, is not seeking to reorganize for a legitimate purpose, and otherwise has no business being the Debtor in this bankruptcy. Simply put, the Debtor's Chapter 11 bankruptcy is being pursued — at the behest of CertainTeed's lawyers and executives, and at the expense of thousands of ongoing civil tort lawsuits — in "bad faith." In fact, the Debtor DBMP has acknowledged that: (1) it can pay its dead and dying asbestos victims in full in the civil tort system; (2) its ultimate French parent, Saint-Gobain, touts and brags in public filings that the Debtor's Chapter 11 bankruptcy has delayed making those payments to asbestos victims for years, allowing the corporate family to reap millions of dollars in savings on attendant litigation costs and

48

expenses; (3) CertainTeed orchestrated the "Texas Two-Step" maneuver with the very specific intention of isolating a single class of its creditors (i.e., its dead and dying asbestos victims), and also intending to shield its run-of-the-mill business creditors — as well as its own corporate affiliates — from the strictures of a Chapter 11 bankruptcy; and (4) the civil court asbestos plaintiffs are the victims of CertainTeed's asbestos-riddled products.

Nor are the above recitations merely the conjecture of an old dissenting judge. Rather, they are findings that were recognized and made by the bankruptcy court when it extended the protections of the automatic stay to CertainTeed at the outset of the Debtor's Chapter 11 bankruptcy. That is, the bankruptcy court actually recognized and found that:

- CertainTeed was "[s]eeking a less expensive way of dealing with these tort liabilities" from claims filed by asbestos plaintiffs;

- The Debtor DBMP's Chapter 11 bankruptcy was a long-formulated plan that started in February 2018, was code-named "Project Horizon" and was "an attorney-created and implemented strategy '[t]o facilitate [CertainTeed's] ability to pursue a § 524(g) resolution' in bankruptcy 'without subjecting the entire . . . enterprise to [C]hapter 11'";

- "CertainTeed never entertained a bankruptcy filing for itself and all of its subsidiaries and affiliates . . . . This was a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities. For such an enterprise, a bankruptcy filing would have serious negative consequences"; and

- "Rather[] than file . . . CertainTeed or the CertainTeed Enterprise in bankruptcy, the Project Horizon plan was to isolate the asbestos liabilities in a single affiliated corporation and file it in [C]hapter 11."

See J.A. 229-32. Taken together, those factual recitations — made by the bankruptcy court in these proceedings — establish beyond peradventure the nature and extent of the Debtor's bad faith. That is, a fully solvent corporation (CertainTeed) consolidated its asbestos-

49

related liabilities into a stooge subsidiary (DBMP), for the sole purpose of pursuing a sham Chapter 11 bankruptcy aimed at denying thousands of victims of their right to a jury trial, and also to coerce favorable settlements from those victims in its preferred bankruptcy forum. Put succinctly, those facts conclusively establish the "bad faith" sufficient to warrant lifting the automatic stay to allow the Bergrud Estate and the Herlihys to proceed with quantifying their civil tort claims in the Washington and California state courts.

Perhaps most disconcerting of all, however, is that the Debtor DBMP presented no evidence to contest or controvert the facts recited above, nor did DBMP even seek to prove that it had acted in good faith. Ignoring the Debtor's burden of proof under § 362(g), the bankruptcy court — and now, the majority — have filled that evidentiary gap with rank speculation that an award of stay relief would adversely impact DBMP's contrived goal of pursuing a Chapter 11 reorganization. But that was and is an impermissible burden-shifting, and it has no place in a § 362(d) analysis. *See, e.g.*, *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990). And it is a mistake for the majority to bless that approach.

## B.

Second, in addition to ignoring the § 362 statutory framework for assessing whether relief from the automatic stay was warranted, the panel majority has erred by justifying the bankruptcy court's flawed actions under the guise of our Court's decision in *In re Robbins*. Despite acknowledging that *Robbins* did not involve a bad-faith bankruptcy, the majority proclaims that the bankruptcy court was nevertheless entitled to rely on that decision and, on that basis, deny the Bergrud Estate and the Herlihys their request for relief from the stay.

50

Despite the majority's insistence, our 1992 *Robbins* precedent simply has no application to these extraordinary circumstances. *Robbins* teaches that, in the context of "good faith" bankruptcies (i.e., bankruptcies that are filed by honest debtors for proper and legitimate purposes), a bankruptcy court is obliged to consider the following factors in assessing whether there is sufficient "cause" to lift the automatic stay under § 362(d):

> (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*See Robbins*, 964 F.2d at 345.[12]

Stated succinctly, *Robbins* does not apply here. Even if it did, however, the factors identified therein decisively weigh in favor of the Bergrud Estate and the Herlihys, and they counsel in favor of affording § 362(d) relief from the automatic bankruptcy stay.

First, the issues presented in the Washington and California lawsuits pursued by the Bergrud Estate and the Herlihys involve pure questions of state law, and the expertise of a bankruptcy court is entirely unnecessary. Second, an order from the bankruptcy court modifying the automatic stay would promote judicial economy, in that the Bergrud Estate and the Herlihys would then liquidate their asbestos tort claims in their state court forums

---

[12] Critically, the *Robbins* precedent does not — and otherwise cannot — displace nor supplant § 362(d)'s statutory framework, as enacted by Congress, for assessing when and if relief from the automatic bankruptcy stay is warranted. *See* 11 U.S.C. § 362(d), (g). And as discussed herein, that statutory framework requires an automatic bankruptcy stay to be lifted "for cause." *See, e.g.*, *Raleigh*, 530 U.S. at 25; *Carolin*, 886 F.2d at 699.

without burdening the bankruptcy court. Lastly, given the Bergrud Estate's and the Herlihys's proposal that they would only seek collection on a judgment in the Debtor's bankruptcy proceedings if and when their claims are finally quantified, it strains credulity to suggest that the state court trials would be "interferences" with the bankruptcy.

C.

Third, the panel majority has improperly relied on our Court's 1989 *Carolin* decision for the proposition that the Bergrud Estate and the Herlihys are not entitled to relief from the automatic stay because the Bankruptcy Code must be considered in some "larger context." *See ante* at 14. In that regard, my friends recite the *Carolin* precedent's standard for securing a wholesale dismissal of a bankruptcy, pursuant to 11 U.S.C. § 1112. Thereunder, a party seeking dismissal of a bankruptcy must show both "subjective bad faith" and "objective futility" on the part of a debtor. *See Carolin*, 886 F.2d at 700-01.

Fixated on that inapt standard, my friends proclaim that "when a bankruptcy court addresses a motion to dismiss a Chapter 11 petition under 11 U.S.C. § 1112(b) (authorizing dismissal 'for cause'), it may consider a lack of good faith as implicit in the 'cause' requirement." *See ante* at 14. From there, the majority leaps further into the abyss of the illogical, asserting that "a bad-faith cause for dismissal of a petition or for granting a motion to lift the automatic stay is not without boundaries." *Id.* That is, the majority blurs the distinction between the dismissal standard under § 1112(b), and the § 362(d) standard for relief from the automatic stay. Not only that, the majority insists that the bankruptcy court correctly applied *Carolin* in ruling that "there was a lack of evidence in the record of

52

subjective bad faith [by the Debtor], and even if there were such evidence, the [Bergrud Estate and the Herlihys] . . . failed to meet the objective futility requirement." *Id.* at 15.

As a threshold matter, it is entirely unclear how *Carolin*'s "objective futility" and "subjective bad faith" requirements — which are relevant to a creditor securing dismissal of a bankruptcy under 11 U.S.C. § 1112 — have any bearing on the discrete question of whether the Bergrud Estate and the Herlihys should have been awarded relief from the automatic stay under 11 U.S.C. § 362(d).[13]  To be sure, our Court in *Carolin* recognized the difference between those two statutory standards.  But the majority ignores that precedent and plows this furrow again. *See* 886 F.2d at 699.  This is another unexplained gap in the majority's rationale, and it could well have disastrous and unintended consequences down the line. *Cf. In re Dixie Broadcasting*, 871 F.2d 1023, 1029 (11th Cir. 1989) ("We disagree that bad faith constituting 'cause' for relief from a stay automatically equates to bad faith warranting dismissal of the petition.  If that were true, there would not be a need to ever lift a stay for bad faith, because the petition would necessarily have to be dismissed.").[14]

---

[13] To the extent *Carolin* could apply in these circumstances — which, for the several reasons discussed herein, it does not — our Court may have to consider en banc the viability of that precedent, given the deluge of similar "Texas Two-Step" bankruptcies that are yet pending in the Western District of North Carolina's bankruptcy court. *See, e.g.*, *In re Bestwall LLC*, No. 17-31795 (Bankr. W.D.N.C.); *In re Aldrich Pump LLC*, No. 20-30608 (Bankr. W.D.N.C.); *In re Murray Boiler LLC*, No. 20-30609 (Bankr. W.D.N.C.).

[14] Although the majority mentions the bankruptcy court's statement that "lifting the automatic stay would amount to a de facto dismissal of the bankruptcy proceeding," my friends do not seriously defend that proposition. *See ante* 3, 9.  Nor can they.  Instead, my friends simply suggest that *Carolin* is satisfied here.  But again, it makes no sense to (Continued)

Undeterred by such details, the panel majority has parlayed its faulty *Carolin* reasoning into the notion that the Debtor DBMP "was legitimately seeking to invoke the § 524(g) process authorized by Congress to address the circumstances in which it faced 60,000 pending asbestos-related claims and expected to receive a continuous flow of such lawsuits for decades to come." *See ante* at 16. Put differently, my friends assert that, in filing its Chapter 11 petition, the Debtor sought "protection that the statute provided" — i.e., by establishing a § 524(g) trust — such that it cannot possibly be the case that the Debtor has acted in "bad faith." *Id.* at 16 (majority stating that "[i]t would be hard to argue that DBMP had subjective bad faith in seeking the protection that the statute provided").[15]

Critically, however, the panel majority's rationale fails to acknowledge a discrete issue raised by the Estate and the Herlihys: that is, does § 524(g) of Title 11 provide a valid reorganization purpose when the Debtor DBMP has acted in bad faith by seeking protection under the Bankruptcy Code in the first place? Contrary to the majority's assessment, the answer to that question must emphatically be <u>NO</u>. Otherwise, any debtor — even one like the Debtor DBMP, acting in abject "bad faith" — can be improperly insulated from

---

conflate the inquiries between a § 1112 dismissal and a § 362(d) award of relief from the automatic bankruptcy stay. Otherwise, the bankruptcy court's "fears" of the motions that could be filed in the future is irrelevant and immaterial. What should have been relevant to the bankruptcy court were the motions then pending and whether those parties — i.e., the Bergrud Estate and the Herlihys — were entitled to § 362(d) stay relief.

[15] As the Supreme Court recently observed in unanimously reversing a bankruptcy decision of this Court, § 524(g) "ensures that health claims can be asserted only against the Trust and that [the debtor's] operating entities will be protected from an onslaught of crippling lawsuits that could jeopardize the entire reorganization effort." *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 273 (2024) (citation modified).

statutory provisions of the Code that provide creditors with relief, such as § 362(d), so long as the debtor invokes § 524(g) as the "basis" for a bogus Chapter 11 reorganization.

Parting with my friends, it is apparent that § 524(g) is a remedy within Chapter 11 and made available to an entity "in financial distress," "proceed[ing] with honesty," and "plac[ing] virtually all its assets on the table for its creditors," to earn "a fresh start." *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 273 (2024); *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209 (2024). It is not a bankruptcy "purpose" that an ultra-wealthy corporation (such as CertainTeed) is entitled to deploy on a whim to drive up profits and satisfy shareholders. As the Bergrud Estate and the Herlihys maintain:

> Congress did not fling open Chapter 11's doors to profitable nondistressed debtors [like the Debtor DBMP] who manipulate their corporate structure to isolate asbestos disease victims when it enacted § 524(g). Rather, § 524(g) was enacted [by Congress] in the wake of the Johns-Manville bankruptcy "for use by any asbestos company facing a similarly overwhelming [to Johns-Manville] liability." H.R. Rep. No. 103-835, at 40-41 (1994)*; see also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640 (2d Cir. 1988) (confirming Manville was faced with "crippling" lawsuits); *id.* at 649 (recognizing Manville was a "financially besieged enterprise in desperate need of reorganization of its crushing debt, both present and future"); S. Rep. No. 95-989, at 9 (1978) (legislative history suggesting Chapter 11 was meant to deal "with the reorganization of a financially distressed enterprise").

*See* Br. of Appellants 39-40 n.19 (citation modified).

Furthermore, the panel majority's view of § 524(g) — which lacks support from either the text or history of the Bankruptcy Code — undermines the fundamental proposition that "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability." *See In re SGL*

55

*Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999); *accord In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 n.1, 1072 n.2 (5th Cir. 1986); *In re South Beach Securities, Inc.*, 606 F.3d 366, 376 (7th Cir. 2010); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 381 (8th Cir. 2000); *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994); *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023, 1027 (11th Cir. 1989). As our distinguished colleague Judge Wilkinson aptly put it not so long ago, bankruptcy is not for "financially healthy companies with no need to reorganize under the protection of Chapter 11." *See In re Premier Auto Servs., Inc.*, 492 F.3d 274, 280 (4th Cir. 2007).

That notwithstanding, the panel majority suggests that the dissent "completely misunderstands the § 524(g) process, which [CertainTeed] . . . invoked here." *See ante* at 19. The same can be said of the majority. In addition to the foregoing discussion, it strains credulity for the majority to suggest that CertainTeed "did not protect *one single dollar from asbestos-related liability*." *Id.* But so what? The Debtor DBMP was fabricated by CertainTeed for the express purpose of circumventing our Nation's civil tort system. *See* Br. of Appellee 14 n.8 (DBMP admitting that it was created by CertainTeed "to overcome the tort system"). And its bankruptcy is nothing more than a gross attempt to "channel" claims into a preferred forum to extract favorable settlements and save CertainTeed money.

Otherwise, my friends in the majority are content to engage in a rather alarming type of extra-legislative judicial "tort reform." Indeed, my friends believe that all corporations facing asbestos-related tort liabilities — regardless of their financial status or ability to pay claims to dead and dying American workers — should be entitled to take advantage of § 524(g) by plundering a fabricated corporate shell entity into a Chapter 11 bankruptcy, all

56

because § 524(g) is "quicker, more efficient, and fairer than can be provided by continuing with widely dispersed litigation in various federal and state courts." *See* ante at 19. But that rationale wrongly encroaches on the public policy prerogatives of the Congress, which has repeatedly rejected industry-sponsored attempts to enact asbestos-related tort reform in the very same manner proscribed today by the majority. *See* Reply Br. of Appellants 15 (citing examples of asbestos-related "tort reform" legislation rejected by Congress). And it otherwise runs afoul of the Supreme Court's command to leave such prerogatives to the Congress. *See, e.g.*, *Amchem Prods. v. Windsor*, 521 U.S. 591, 628-29 (1997) (Ginsburg, J.) (recognizing, post-enactment of 11 U.S.C. § 524(g), that argument could "sensibly [be] made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure," but otherwise emphasizing that "Congress . . . has not adopted such a solution"); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 865 (1999) (Rehnquist, C.J., concurring) ("[W]e are not free to devise an ideal system for adjudicating [asbestos] claims. . . . [T]he elephantine mass of asbestos cases cries out for a legislative solution." (citation modified)).

\* \* \*

At bottom, my friends in the panel majority have recognized that "[w]hen a debtor manipulates the bankruptcy procedure for *some other purpose* or *steps outside the equitable limitations* of the Bankruptcy Code, his good faith comes into question, placing in doubt any relief he seeks in bankruptcy." *See ante* at 14 (emphasis added). And that is precisely what occurred here. As related above, however, the majority has ignored that

57

proposition and excused the extensive "bad faith" of the Debtor DBMP — its owners, CertainTeed and the French entity, Saint-Gobain — which fatally infects this record.

IV.

All these pages later, I am unable to shake off the prophetic and impactful words of the late Judge Joseph H. Young of the District of Maryland.  Judge Young's words are the proverbial "canary in the coal mine," and they bear repeating once more:

> Chapter 11 [of the Bankruptcy Code] was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability. And the purpose of the automatic stay is to preserve a debtor's assets and permit an orderly, as opposed to chaotic, distribution or reorganization. *The automatic stay was not intended to grant defendants a last-minute escape chute out of pending civil litigation.*

*See Furness v. Lilienfield*, 35 B.R. 1006, 1009 (D. Md. 1983) (emphasis added).

By today's decision, the panel majority ignores Judge Young's 43-year-old klaxon call and continues our Court's distressing march into being the "safe harbor" for the "big guys" — here, CertainTeed, acting through its stooge subsidiary, the Debtor DBMP, and at the behest of its French parent, Saint-Gobain — that seek bankruptcy protection to avoid accountability for their asbestos-related tort liabilities.  I will not support that effort. Rather, I am of opinion that the Bergrud Estate and the Herlihys are entitled to the limited relief they seek — that is, relief from the automatic stay in order to quantify their state-law asbestos tort claims against CertainTeed, the Debtor DBMP, and other corporate entities.

Pursuant to the foregoing, I am compelled to wholeheartedly dissent.